# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA    :

        v.                  :        CRIMINAL NO. 19-342

YAHAIRA DIAZ               :

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by its attorneys, William M. McSwain, United States Attorney for the Eastern District of Pennsylvania, and Louis D. Lappen, Deputy United States Attorney for the District, hereby submits its sentencing memorandum in the above-captioned case.

## I.    PRELIMINARY STATEMENT

Yahaira Diaz helped lead a scheme to defraud at least 10 elderly victims of at least $158,000 and attempted to defraud those victims of at least an additional $69,000. The scheme was particularly insidious as it preyed on the emotions of these vulnerable victims who thought their grandchildren were in serious trouble and desperately needed money. With their imposter grandchildren often crying into the telephone, the criminals convinced the victims to part with funds they could not afford to lose in their later years. After the victims sent the money, the criminals continued to hound them for more money until the victims realized that they were getting scammed. The victims were left feeling cheated and humiliated, and at this stage of their lives, unable to recover the much-needed lost funds. This scam is all too common in our area, as numerous elderly

individuals have received these calls trying to convince them to part with their money for the grandchildren. The victims of the fraud in this case have expressed in their victim impact statements that they have suffered tremendous hardship and stress at the hands of the defendant and her co-conspirators.

Demonstrating her commitment to criminal behavior and indifference to its effect on victims, the defendant also engaged in credit card fraud and identity theft. The defendant engaged in these offenses after some history of less serious drug and theft crimes. The defendant's participation in these schemes call for serious punishment as recognized by the applicable guideline range and mandatory minimum sentence. Accordingly, and for all the reasons set forth below, the government recommends a sentence within the advisory guideline range of 65 to 75 months' imprisonment, which includes a two-year statutory mandatory minimum sentence for identity fraud.

## II.     SUMMARY OF THE CRIMINAL ACTIVITY

### A. Grandparents Scheme

In or around January and February 2018, defendant Yahaira Diaz engaged in a scheme to defraud elderly individuals of thousands of dollars in what has been called the "Grandparents Scheme." In this scheme, the defendant's co-schemers telephoned elderly individuals ("the grandparents") throughout the United States and, while posing as a lawyer or court official, told them that their loved one, generally their grandchild, had been involved in a vehicular accident in Pennsylvania and needed a particular sum of

money, at least several thousand dollars, to pay for legal and other expenses resulting from the accident, such as bail to be released from prison or legal fees.  In some instances, the co-schemers also posed on the telephone as the grandchild, often crying into the phone, to make an emotional plea with the grandparents and further convince them that their grandchild needed money. In those telephone calls, the co-schemers then directed the grandparents to send cash for their grandchild to a particular address where the co-schemers would collect the cash.

In those telephone calls, to further convince the grandparents to send the cash, the co-schemers described the grandchild's situation as increasingly serious, by claiming the following: that the grandchild had been arrested for driving under the influence; that a pregnant woman was involved in the accident; that the pregnant woman and her unborn child were injured or killed; that the grandchild would not be released from prison without additional funds; and that legal and other fees were mounting.

To increase the likelihood that the scheme would succeed and to help conceal it from authorities, the co-schemers told the grandparents that the situation was embarrassing for the grandchild and that that the grandparents should not share the information with other family members. To ensure that the victims' cash would arrive safely with the co-schemers, the co-schemers directed the grandparents to tape cash inside a magazine, place the magazine in packaging for mailing, and then send the package to a designated address via an overnight service such as the United States Postal Service Priority Mail, Federal Express, and United Parcel Service.

3

If the grandparents sent cash as directed by the co-schemers, the co-schemers would call the grandparents again and ask for more cash, claiming that additional funds were necessary for their grandchild's legal expenses or bail and, at times, the grandparents complied with these demands. The co-schemers would continue to call the grandparents and demand additional funds until they stopped sending money.

The defendant played a supervisory role in this scheme, which was extensive and involved more than five participants. She identified residential locations in Pennsylvania, including in Allentown and Bethlehem, in the Eastern District of Pennsylvania, for the elderly victims to send the packages of cash. The defendant identified locations that were either vacant or were owned and controlled by other individuals whom the defendant recruited to assist her in this scheme. The defendant would convince the owners of these properties to receive the packages and provide them to the defendant or one of her co-schemers. The defendant also recruited individuals to assist her in retrieving the packages of cash when they were delivered to the residential locations that she selected, and to retrieve the packages from the United States Post Office or other commercial carrier if the packages were not delivered to the residential locations.

The defendant and her co-schemers retrieved the packages of cash from the locations to which they were delivered and then distributed the fraud proceeds to others involved in the scheme. In total, as a result of this scheme, the defendant and her co-schemers defrauded at least 10 elderly victims of at least $158,800 and attempted to defraud those victims of at least an additional $69,000.

A more detailed summary of the facts relating to the ten individual victims of the defendant's scheme and a description of the mailings in furtherance of the scheme are as follows:

1.  Victim W.W.

On February 20, 2018, W.W., a resident of Lake Village, Arkansas received a telephone call informing him that his grandson was involved in a vehicular accident and arrested for driving under the influence ("DUI"). W.W. was 93 years old at the time of the call. The caller claimed to be an attorney by the name of James Lee and stated that he needed $5,000 in cash to get W.W.'s grandson released from jail on bail. "Lee" said that W.W.'s grandson was in serious trouble because he struck a vehicle with a female passenger who was eight months pregnant.

"Lee" told W.W. to send the cash to an address in Bethlehem, PA, via United States Postal Service ("USPS") Priority Mail, and to tape the cash inside a magazine. While W.W. was initially skeptical of the caller, the caller persuaded him to send the money, which W.W. did, as instructed.

On February 21, 2018, "Lee" again telephoned W.W. "Lee" told W.W. that, following the accident, the pregnant passenger lost her baby. "Lee" said that he needed an additional $5,000 in cash for the grandson because the bail was increased. W.W. asked to speak to his grandson. At this point, W.W. heard an individual in the background, whom he believed was his grandson, crying and telling W.W. in an upset voice to send the $5,000 and not tell any family members about the situation. As set forth in Count Three

5

of the information, on February 21, 2018, W.W. did as instructed and sent $5,000 via USPS Priority Mail from Arkansas to the Bethlehem address provided by the schemers.

On February 24, 2018, "Lee" again telephoned W.W. and claimed that he needed an additional $2,000 in cash to obtain bail for W.W.'s grandson. W.W. became suspicious and telephoned the Chicot County Sheriff's Office to report the situation to police. The Sheriff's Office then sought the assistance of the Bethlehem Police Department where officers quickly determined that the Bethlehem address was a vacant home. W.W. then began cooperating with local authorities (with the assistance of the U.S. Postal Investigation Service ("USPIS")), to help them set up a controlled delivery to the Bethlehem address.

On February 27, 2018, Bethlehem Police officers, working with agents from the USPIS, created a package containing magazines (but no money) that appeared to have been sent by W.W., via USPS Priority Mail, with the USPS package tracking system number showing that the package originated in Arkansas and was scheduled for delivery on February 27, 2018.

Later that day, Bethlehem Police officers and agents of the USPIS executed a controlled delivery of the USPS Priority Mail package to the Bethlehem address. The defendant drove to that address in a silver Honda Accord with another individual, V.S., who picked up the package from a USPS undercover agent posing as a U.S. Postal Carrier. V.S. then delivered the package to Diaz. Officers later arrested Diaz and recovered from the Honda the Priority Mail package (which had been opened)

purportedly sent by W.W. as well as a Federal Express package, previously opened and empty, sent from another victim of the Grandparents Scheme, E.K. of Erlanger, Kentucky, to another Bethlehem address associated with the defendant.

Officers arrested the defendant and seized her cellular telephone, incident to her arrest. On March 8, 2018, Bethlehem Police obtained a search warrant for the defendant's cell phone, which revealed additional evidence, discussed below, showing that the defendant was involved with numerous other instances of the Grandparents Scheme as well as credit card fraud.

       2.  Victim E.K. and his wife, Ei.K.

E.K. is a 93-year-old man who lives with his 90-year-old wife, Ei.K., in Erlanger, Kentucky. On February 26, 2018, E.K. and Ei.K. received a telephone call from a person claiming to be their granddaughter, whom the caller identified by name. The granddaughter said that she was in a car accident in Ohio and needed bail money to be released from jail. Another woman then spoke on the telephone and claimed to be "Deputy Harris," a law enforcement officer who repeated the granddaughter's request for bail money from her grandparents. E.K. and Ei.K. heard a young woman crying in the background and thought it was their granddaughter. Even though they were concerned that this could be a scam, they were upset after hearing the crying and they agreed to send money. "Deputy Harris" instructed them to send $7,000 in cash, placed inside the pages of a magazine, to an address associated with the defendant in Bethlehem, which the victims did.

Diaz's cell phone revealed a text exchange between Diaz and an individual, C.H., in which they discussed Bethlehem addresses that Diaz provided for use in the scheme.

3.   Victim C.B.

C.B. is an 86-year-old woman living in Rock Falls, Illinois. On February 23, 2018, C.B. received a telephone call from an individual whom she believed was her grandson. Her "grandson" (who used his name during the conversation) told C.B. that he was in a car accident that involved a pregnant woman. Her "grandson" sounded extremely upset and asked C.B. not to tell any family members about the call and that a lawyer would call her.

A short time later, a man called, claiming to be an attorney representing her grandson. He asked C.B. to send $7,800 in $100 bills, taped inside the pages of a magazine, via Federal Express, to a Bethlehem address. Convinced that her grandson was in trouble, C.B. did as she was instructed.

The following day, the "attorney" called C.B. again and said that he needed more money for legal fees. He asked for $20,000, and C.B. agreed to provide the funds. When C.B. tried to withdraw the cash from her bank, a bank employee called C.B.'s daughter, and together, they realized that C.B. was a fraud victim, and thus she did not send more money.

Diaz's text exchange with C.H., noted above, further linked Diaz to this victim. Specifically, on February 22, 2018, Diaz provided C.H. with the Bethlehem address that C.B. used to send the funds for her grandson. Diaz and C.H. also discussed in text

exchanges the delivery and collection of the package that Diaz was arranging.

### 4.  Victim T.E.

T.E. is a 76-year-old man who was living in Tinley Park, Illinois. On February 11, 2018, T.E. received a telephone call from a man who identified himself as T.E.'s grandson (whom the caller named in the conversation). The "grandson" said that he had been arrested for DUI after an automobile accident. The "grandson" implored T.E. not to tell anyone about the accident and asked T.E. to speak with his attorney, "James Lee," who was with him. "Lee" then spoke with T.E. and asked him to send cash for attorney's fees and to repair T.E.'s car. T.E. complied, and after sending money, "Lee" continued to call and ask for additional funds. Similar to the methods used to lure the other victims of this scam, "Lee" induced T.E. to send more money by telling T.E. that a woman involved in the accident was pregnant and lost her baby as a result of the accident. "Lee" directed T.E. to send the cash to an address in Mount Carmel, PA. As directed, T.E. sent a total of $29,500 in four separate mailings, which he obtained from his own accounts and by borrowing money from his daughter. After sending this money, "Lee" called T.E. and urged him to send an additional $10,000 to a New York address, but T.E. refused.

Numerous text messages from February 2018 between Diaz and a coworker, A.B., showed that Diaz was using A.B.'s residence in Mount Carmel, PA for delivery of T.E.'s packages. Diaz's phone also contained a video recording of Diaz opening a package containing $10,000 in cash in A.B.'s bathroom.

### 5.  Victim J.S.

J.S. is a 75-year-old man who lives in Port Orchard, Washington. In early February 2018, J.S. received a call from an individual identifying himself as J.S.'s grandnephew, identified by name at some point during the conversations. The "grandnephew" called J.S. "grandpa" and said that he was in a car accident, he hit a woman who was pregnant, and he was in custody for driving under the influence. The "grandnephew" said that he was embarrassed and asked J.S. not to tell anyone else in the family about the situation. The "grandnephew" said that he would have a lawyer call J.S. for help. One hour later, an individual called J.S. claiming to be her grandnephew's lawyer. The "lawyer" said that her grandnephew needed $15,000 for bail, and J.S. said that he did not have that much money.

After some discussion, J.S. agreed to send the lawyer $10,000. The "lawyer" instructed J.S. to tape $100 bills totaling $10,000 inside a magazine and send the magazine via Federal Express to the grandnephew at a Mt. Carmel, PA address that was the home of A.B., discussed above. J.S. actually looked up the residence on the internet and saw that it looked "like a shack." When J.S. told the "lawyer" that he was concerned about this location, the "lawyer" told him it was a "safe house" and to send the money and not disclose this to anyone or the price would increase. On February 9, 2018, J.S. did as he was instructed and sent $10,000 cash via Federal Express to the Mt. Carmel address that the "lawyer" provided.

Records from Diaz's telephone show a text exchange on February 10, 2018 between Diaz and A.B. discussing the delivery of the package to A.B.'s address and

10

Diaz's instructions to A.B. and arrangements to pick it up.

A few days after sending the original funds, the "lawyer" again called J.S. and asked for additional money. The "lawyer" tried to convince J.S. that his grandnephew was in the background crying, but J.S. became skeptical and called his grandnephew. Obviously, when he spoke with him, J.S. realized that he was a fraud victim.

6.   Victim V.C.

V.C. is a 79-year-old woman who lives in Grapevine, Texas. In February 2018, she received a telephone call from a man claiming to be a lawyer for her grandson. Using her grandson's name, the "lawyer" said that the grandson was in jail for driving under the influence, and that her grandson's vehicle struck a pregnant woman. The "lawyer" said that her grandson needed $13,000 for bail. The "lawyer" instructed V.C. to tape $100 bills totaling $13,000 inside a magazine and send the magazine via Federal Express to an Allentown, PA address. The "lawyer" directed V.C. not to tell anyone about this, including her family members, because her grandson was upset and threatening to commit suicide. As set forth in Count One of the information, on February 3, 2018, V.C. did as she was instructed and sent $13,000 in cash via Federal Express from Texas to the Allentown address that the "lawyer" provided.

A few days later, the "lawyer" called V.C. again and said that he needed more money because the judge, who had lost his son in a DUI accident, increased the amount of bail required for her grandson's release. The "lawyer" instructed V.C. to send an additional $27,000 in two separate packages to the same address, which she did. A few

days later, the "lawyer" called again to ask for money, but V.C. refused because she could not afford to send more money.

Records from Diaz's phone show that she was using the Allentown address for this scheme. On February 2, 2018, Diaz communicated via text with an individual, "L." Diaz texted "L," "Send me the address. Now." "L" responded with the Allentown address. In further text exchanges, Diaz asked "L" for additional addresses for the scheme.

       7.   Victim V.O.

V.O. is an 84-year-old man who lives in Mill Creek, Washington. On February 9, 2018, V.O. received a telephone call from a man claiming to work for the court system in Boise, Idaho. The man said that V.O.'s grandson was in a car accident and was in jail. The man said he was trying to help V.O.'s grandson, whom he identified by name, get out of jail. He then put the "grandson" on the telephone. The "grandson" said he broke his nose in the accident and it was hard for him to speak, but that he needed V.O.'s financial help and that he must not tell V.O.'s parents. The man then picked up the phone and told V.O. that he needed a few minutes to address matters relating to the accident.

After a few minutes, the man called back and said that the judge would meet with him and that the man would try to keep bail under $10,000. The man then asked V.O. to send him $9,500 and to tape the cash inside two magazines and send the magazines via Federal Express to an address in Allentown, PA. As set forth in Count Two of the Information, on February 9, 2018, V.O. did as he was instructed and sent $9,500 in cash

via Federal Express from Washington to the Allentown address.

Text messages recovered from Diaz's telephone reveal a discussion on February 8 and 9 between Diaz and an individual, "M," in which Diaz arranged for "M' to pick up the package from V.O.

8.   Victim C.M.

C.M. is an 81-year-old woman who lives in Bay City, Michigan. In February 2018, she received a telephone call from a man identifying himself as "Phillip Morris." "Morris" said that her grandson (identified during the conversation by name) had been in a car accident involving a pregnant woman and that he was in jail and needed $10,000 as a retainer for an attorney. When C.M. did not immediately agree to send the money, she received several additional calls urging her to do so, and she eventually relented. As directed, on February 27, 2018, she sent $10,000 in cash via Federal Express by taping $100 bills inside a magazine. She sent the package from Michigan to an Allentown address.

Text messages recovered from Diaz's telephone confirm that Diaz was using this Allentown address for the fraud scheme.

9.   Victim W.B.

W.B. is a 77-year-old woman who lives in Tupelo Missouri. In early February 2018, W.B. received a telephone call from and individual who told her that her grandson had been arrested. The caller used her grandson's name and put the "grandson" on the telephone. The "grandson" said that he had been arrested and needed money for bail. He

13

further told W.B. not to tell his parents about the incident. W.B. believed that she was talking to her grandson and agreed to send the money. Her "grandson" instructed W.B. to tape cash totaling $2,000 inside a magazine and send the magazine via United States Express Mail to him at the Mt. Carmel, PA address (the home of A.B. discussed above). On February 8, 2018, W.B. did as she was instructed and mailed the package with the money to the Mt. Carmel address.

Records from Diaz's telephone show a text exchange on February 9, 2018 between Diaz and A.B. discussing the delivery of the package to A.B.'s address and Diaz arranging to pick it up.

10.   Victim M.T.

M.T. is an 83-year-old woman who lives in Hilo, Hawaii. On February 21, 2018, M.T. received a telephone call from an individual who identified himself as her son-in-law. Using her son-in-law's name, he said that he was in a car accident in Pennsylvania and was arrested because he was responsible for injuring other individuals. The "son-in-law" said that he was going to put his lawyer, "Nicholas John," on the telephone who would give her instructions about sending him money to keep him out of jail. Her "son-in-law" told M.T. not to tell any family members about this situation. M.T. spoke to "John" who directed her to send $15,000 to an address in Minersville, PA, which she agreed to do. M.T. then withdrew $15,000 from her home equity line of credit with the Bank of Hawaii and sent the funds via USPS Express Mail to the Minersville address.

The following day, February 22, 2018, "John" again called M.T. and said that her

14

son-in-law now needed an additional $55,000, and that if he did not receive the money, her son-in-law would go to jail. M.T. told "John" that she was not sure she had the money, but would try to get it and send it to Minersville. M.T. then returned to her bank, where bank employees inquired about the reason for the withdrawals and wisely tried to stop M.T. from withdrawing the funds. M.T. was persistent with the bank, and even traveled to a different branch to get the funds for her son in law. She was able to obtain $18,000 in cash, which she then sent via USPS Express Mail to the Minersville address.

The following day, M.T. was able to obtain from her bank the remaining $37,000 that she thought she needed to keep her son-in-law out of jail. She sent the funds via Federal Express to Minersville. However, after doing so, she became suspicious, spoke with her family, and was able to get Federal Express to return the package to her before it was delivered to the criminals.

Records from Diaz's telephone show a text exchange on February 12, 2018 between Diaz and "W" providing addresses for the scheme, including the Minersville address that the victim used to send the fraud proceeds.

B. Identity Theft and Fraudulent Credit Card Scheme

As described in Counts Four and Five of the information, the defendant also engaged in credit card fraud and identity theft. In January and February 2018, Credit One Bank sent several credit cards in the names of other individuals to the defendant's residence in Pottsville, PA ("the residence").  Those individuals did not request the bank

15

to send those cards to the defendant. The defendant's cell phone contained photographs of these credit cards and accompanying paperwork from Credit One Bank. The individuals in whose names the defendant obtained credit cards included J.W. and his wife, L.W., S.S. and his wife, E.S., and K.W.

These individuals are all actual customers of Credit One whose identities were stolen to obtain these credit cards. They did not give the defendant or anyone else permission to obtain the credit cards or to use them for purchases. The defendant and co-conspirators working with her obtained the cards by calling Credit One, posing as the identity fraud victim and asking for cards to be sent to a new address (Diaz's residence). To obtain the cards, the defendant and her co-conspirators provided the fraud victims' names, mailing addresses, telephone numbers, account numbers, partial social security numbers, and dates of birth.

After the defendant fraudulently obtained the credit cards in the names of these individuals, they were used as follows:

    a. **J.W. and L.W. Credit One Visa Card ending in 1147** – The cards were fraudulently used in February 2018 for charges totaling $1,417.85. Those charges included three Visa gift card purchases on February 5, 2018 at the Giant grocery store in Nazareth, PA.

    b. **S.S. and E.S. Credit One Visa Card ending in 0401 --** The cards were fraudulently used in February 2018 for charges totaling $3,168, including five Visa gift card purchases at the Giant grocery store in Easton, PA.

    c.  **K.W. Credit One Visa card ending in 1232** -- The cards were fraudulently used in January for charges totaling $1,922.44, including Visa gift card purchases at the Giant grocery store in Pottsville, PA and other stores in Allentown and Bethlehem, PA.

## III.   <u>STATUTORY MAXIMUM AND MANDATORY PENALTIES</u>

The Court may impose the following statutory maximum and mandatory minimum sentences: Counts One through Three (mail fraud), for each count, 20 years' imprisonment, a three-year period of supervised release, a $250,000 fine, and a $100 special assessment; Count 4 (access device fraud), 10 years' imprisonment, a three-year period of supervised release, a $250,000 fine, and a $100 special assessment; Count 5 (aggravated identity theft), a mandatory term of two years' imprisonment, to be served consecutively to any sentence imposed under any provision of law, including any term of imprisonment imposed for mail fraud and access device fraud as charged in the information, a one-year term of supervised release, a $250,000 fine and a $100 special assessment.

<u>Total Maximum and Mandatory Minimum Sentence</u> is:  72 years' imprisonment, including a mandatory term of two years' imprisonment, to be served consecutively to any sentence imposed under any provision of law, including any term of imprisonment imposed for mail fraud and access device fraud as charged in the information, a three-year period of supervised release, a $1,250,000 fine, and a $500 special assessment. Full restitution of $165,308 also shall be ordered. Forfeiture of as much as $165,308, representing all proceeds from the offenses also may be ordered.

IV.     **SENTENCING GUIDELINES**

The government agrees with the following sentencing guideline calculation which is set forth in the presentence investigation report. Under U.S.S.G. § 2B1.1(a)(1), the base offense level for the defendant's conduct is 7. Under U.S.S.G. § 2B1.1(b)(1)(F), the fraud loss was more than $150,000 but less than $250,000, resulting in a 10-level increase to the base offense level. Under U.S.S.G. § 2B1.1(b)(2)(A)(i), the defendant's offenses involved 10 or more victims, resulting in a 2-level increase to the defendant's base offense level. Under U.S.S.G. § 3A1.1(b)(1), in connection with Counts One through Three of the information, the defendant knew or should have known that the victims of this offense were vulnerable victims due to their age, mental condition, and particular susceptibility to the criminal conduct, resulting in a 2-level increase to the base offense level. Under U.S.S.G. § 3B1.1(b), in connection with Counts One through Three of the information, the defendant was a manager or supervisor (but not an organizer or leader), and the criminal activity involved five or more participants and was otherwise extensive, resulting in a 3-level increase to the base offense level. Under U.S.S.G. § 3E1.1, the defendant has timely accepted responsibility for her offense, resulting in a 3-level downward adjustment.

This results in a total offense level of 21. Because the defendant is in Criminal History Category II, her sentencing guideline range is 41 to 51 months in prison, plus a

mandatory minimum consecutive sentence of 24 months on Count 5 (identity fraud). This results in a total range of 65 to 75 months' imprisonment.

The defendant agrees with the guideline calculations as set forth above except that she now challenges the 2-level upward adjustment for vulnerable victims under U.S.S.G. § 3A1.1(b)(1). While the defendant at the time of the plea stipulated to the enhancement, she has now decided to challenge its application. Under all the circumstances, the government does not object to the defendant's withdrawal of the stipulation and will not seek to enforce it. Rather, the government requests that based on the facts of the case, this Court find that this adjustment applies.

Section 3A1.1(b)(1) provides for a 2-level upward adjustment where "the defendant knew or should have known that the victim of the offense was a vulnerable victim." Application Note 2 to this section defines "vulnerable victim" in relevant part as "a person (A) who is a victim of the offense of conviction . . . and who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." The application note emphasizes that the section "applies to offenses involving an unusually vulnerable victim in which the defendant knows or should have known of the victim's unusual vulnerability." The application note further distinguishes, by way of example, between a case where defendant marketed his fraud to vulnerable victims; and a case where the defendant's fraud targeted any type victim, but one of the victims happened to be vulnerable. Application Note 2, U.S.S.G. § 3A1.1.

Here, the record well establishes that, at a minimum, the defendant should have known that her victims were vulnerable, and more likely that she had actual knowledge of this fact. The fraud clearly targeted elderly victims who were vulnerable to the demands that the victims send money to help their grandchildren who were in trouble. The defendant played a significant role in the scheme, and thus likely knew the nature of the scheme in which she was participating. She was actively and repeatedly involved in identifying and securing locations for the victims to send money and recruiting individuals who controlled residences and others to help her collect the proceeds. Those who are involved in that level of criminal behavior typically know the basic nature of the crime they are committing.

The defendant also engaged in text messaging that supports the common sense conclusion that she understands the nature of the fraud. She texted a confederate a picture of a used Mercedes Benz she was considering purchasing and said, "I been making mad money." She said to another confederate about the addresses she was finding for the scheme, "We workin Btown now," meaning that the scheme was targeting Bethlehem. That is not the language of an innocent dupe. The evidence suggests that she knew exactly what she is involved in, including that the scheme targeted elderly victims.

If the defendant did not have actual knowledge that her co-conspirators were targeting elderly victims, she was willfully blind to the nature of her scheme. This also qualifies her for the adjustment because by definition, in turning a blind eye, she "should have known" the basic facts of the scheme, including that the victims were vulnerable. As

20

reflected in Application Note 2 discussed above, the enhancement is designed to punish more severely those who participate in schemes that target vulnerable victims as opposed to those defendants who just happen upon vulnerable victims. The defendant's scam clearly targeted elderly and thus vulnerable victims, and in fact, preyed on their vulnerability. The defendant should be held responsible for that aggravating factor in the scheme.

## V.   SENTENCING ANALYSIS

The Supreme Court has declared:  "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 128 S. Ct. 586, 596 (2007). Thus, the Sentencing Guidelines remain an indispensable resource for assuring appropriate and uniform punishment for federal criminal offenses.

This Court must also consider all of the sentencing considerations set forth in 18 U.S.C. § 3553(a).  Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy

21

statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

### **Consideration of the 3553(a) Factors**

### **(1)   The nature and circumstances of the offenses**

The nature and circumstances of the defendant's criminal conduct is extremely serious and calls for serious punishment. The defendant and her co-conspirators targeted elderly victims and preyed on their vulnerability. They cheated the elderly victims out of tens of thousands of dollars by convincing them that their grandchild was in trouble and needed their financial help. The victim impact statements in this case make clear how devastating these crimes were to the victims.

For example, S.E., the widow of the victim, T.E., who lost $29,500 by sending money repeatedly to the residences where the defendant was collecting fraud proceeds, submitted a powerful statement about the damage the defendant and her cohorts caused. T.E. thought he was helping his grandson who had been involved in an accident where a pregnant woman was injured and lost her baby. S.E. explained how her husband, ordinarily a tough and stoic man, was locking himself in his office and "crying because our grandson was in so much trouble." PSI ¶ 62, p.16-17. T.E. was suffering from serious medical issues which became aggravated over the stress of his grandson's purported legal problems. In one conversation with the individual posing as his grandson's lawyer, T.E.

22

was so stressed he was having trouble breathing. *Id.*, p.17. S.E. emphasized,

> I need to add this NEVER was far from my husband's mind, to the day he died on July 13, 2019. He talked about how foolish he felt . . . . Also, the distraught, crying voice of our "grandson" who was difficult to understand. Except for his pleas not to tell anyone. And begging for help. What grandparent can withstand that? Not my husband. His grandchildren were his life. To this day I despise the people who put this scam together. They made his last days miserable, sad and, most importantly to him $40,000 less in our savings that would be left for the rest of my life.

*Id.,* p.18.

Other victims described how the fraud devastated them financially and emotionally, leaving them in a difficult position in retirement. W.B. described the crime as causing "a very hurtful and long drawn out experience," and a continuing "stressful situation." *Id.,* ¶ 58, p.14-15. C.B. explained, "As a retiree living on a fixed income, this substantial loss of funds is a hardship." *Id.,* ¶ 59, p.15. V.O. explained, "This experience has profoundly affected my state of mind since the event. Rarely does a day go by that I don't think of the day that I got the phone call that has caused me so much anguish." *Id.,* ¶ 60, p.15. These are just few examples of the pain, heartache, and financial hardship that the defendant and her cohorts caused these vulnerable victims.

In addition, the defendant engaged in thousands of dollars in identity fraud, contributing to a growing problem in our society of criminals stealing identities and trying to capitalize on the offense. Victims routinely feel violated and lose trust in the safety and security of our financial systems even if they are reimbursed for their losses. This conduct also calls for serious punishment and appropriately carries with it a

23

mandatory minimum sentence of 24 years. Considering the full scope of the defendant's criminal activity here and its incredibly serious and damaging nature, this Court should impose a guideline sentence.

      **(2)**      <u>**The history and characteristics of the defendant.**</u>

The defendant's history and characteristics are not mitigating. The defendant reported that she "had a great childhood," and had every opportunity to lead a law abiding life. Instead, she has had several brushes with the law, including convictions for smaller drug and theft offenses. While the defendant claims that she committed this fraud to help support her family, she also could have supported her family by getting a job. Instead, she lived on public benefits and crime proceeds, and was spending her money shopping for a Mercedes Benz (four days before getting arrested while she was committing these crimes against the elderly). Her character and history are consistent with that of a criminal and support the government's request for a sentence within the applicable guideline range.

      **(3)**      **The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; and**

      **(4)**      **the need to afford adequate deterrence to criminal conduct, and to <u>protect the public from further crimes of the defendant.</u>**

As discussed above, this is an extremely serious case that calls for a substantial guideline sentence within the range of 65-75 months in prison. Such a sentence would appropriately punish the defendant for engaging in crimes that have such a devastating

financial and emotional impact on its victims. A guideline sentence would also promote respect for the law and deter the defendant and others who are involved in this criminal activity, which is far too prevalent in our society, from committing this crime in the future. The defendant and other potential criminals must receive the message that the justice system will not tolerate this type of behavior and the punishment will be severe. The defendant obviously did not learn her lesson when she was first convicted for more minor offenses. Instead, she escalated her conduct to this higher and more devastating level. This Court must likewise escalate the sentence as called for by the guidelines and the statutory mandatory minimum.

**(5)     The need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner.**

The defendant can further her educational and vocational training by taking advantage of opportunities in prison. Thus, this statutory factor should not affect the Court's sentencing determination.

**(6)     The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.**

Imposing a guideline sentence is the best way to avoid unwarranted sentencing disparities since the Sentencing Commission has determined that this range is appropriate in cases such as this one. There is nothing in the record to suggest that a guideline sentence here would result in any unwarranted disparities. This factor also supports the government's request for a guideline sentence.

(7)      **The need to provide restitution to any victims of the offense.**

The defendant will have difficulty paying restitution under any circumstances as she has not held a full time job in years and has few assets. She will have to work in prison and find employment when she is released. This factor should not affect the Court's sentence.

## VI.      SENTENCING RECOMMENDATION

For all the reasons set forth above, the government requests that this Court impose a sentence of imprisonment within the guideline range of 65-75 months in prison. The government also recommends that the Court order restitution of $165,308 and forfeiture of $165,308.

The government also recommends that the Court remand the defendant to the custody of the U.S. Marshals immediately following the sentencing. Title 18, United States Code, Section 3143(a), provides as follows:

(a)      Release or Detention Pending Sentence

Except as provided in paragraph (2), the judicial officer shall order that a person who has been found guilty of an offense and who is awaiting imposition or execution of sentence, other than a person for whom the applicable guideline promulgated pursuant to 28 U.S.C. 994 does not recommend a term of imprisonment, be detained, unless the judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released under section 3142(b) or (c). If the judicial officer makes such a finding, such judicial officer shall order the release of the person in accordance with section 3142(b) or (c).

Thus, to be released pending execution of sentence, the defendant must prove by clear and convincing evidence that she is not likely to flee or pose a danger to the safety of any other person or the community if released.

The defendant cannot sustain this heavy burden of proof because she presents a clear flight risk. The defendant likely will receive a substantial sentence of imprisonment which will provide the incentive to flee. She also has the opportunity and means to flee because she has strong connections to the Dominican Republic, where her mother resides. She has also associated with known criminals, particularly those in the Latin Kings Gang in Allentown, to whom she has remained loyal. She has a documented history of engaging in identity fraud, which has included her obtaining false identification documents. Text messages recovered from her cell phone explicitly show her involvement in obtaining false identifications. She easily could have such false identifications at her disposal to flee the jurisdiction, avoid the punishment that awaits her, and join her family in the Dominican Republic. Consequently, the government

recommends immediate remand.

Respectfully submitted,

WILLIAM McSWAIN
United States Attorney


s/ Louis D. Lappen
LOUIS D. LAPPEN
Deputy United States Attorney

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the Government's Sentencing

Memorandum has been filed on ECF and thus served upon:


Nancy MacEoin
Office of the Federal Defender
Curtis Center
Philadelphia, PA 19106
Nancy_MacEoin@fd.org



/s Louis D. Lappen
Deputy United States Attorney




Date:  November 27, 2019

29